**Thomas M. SONAGGERA, and the Workers' Compensation Court, Respondents,**

v.

**DAYTON TIRE & RUBBER CO., and Insurance Company of North America, Petitioners.**

No. 55452.

Court of Appeals of Oklahoma, Division No. 2.

Feb. 24, 1981.

Rehearing Denied March 20, 1981.

Released for Publication by Order of Court of Appeals April 16, 1981.

Thomas A. Bamberger, Oklahoma City, for respondents.

Tenal S. Cooley, III, Looney, Nichols, Johnson & Hayes, Oklahoma City, for petitioners.

BRIGHTMIRE, Judge.

On June 10, 1980, the trial judge awarded 33-year-old Thomas Sonaggera temporary total disability compensation for a period not to exceed 300 weeks. The employer and its carrier appeal contending: (1) the order allowing claimant to change physicians was improper; (2) the award of temporary total compensation from March 5, 1980, to March 11, 1980, was erroneous; and (3) the treatment prescribed by claimant's physician does not constitute "medical" treatment under the compensation law. We affirm.

I

The parties stipulated that the rubber worker—a tire inspector—was injured on the job January 7, 1980. When he helped, he said, "pick up [some] heavy truck tires and threw them up overhead onto a rack . . . a pretty good distance . . . that is when I hurt my back."

Claimant reported the injury "to the company" shortly thereafter and was told to see the company doctor, a Dr. Petty, the next day. He did. Petty looked at him, told him he "had a strain," and sent him to Robert R. Dugan, M.D., at the McBride Clinic. Dugan told him he "had severe muscle strain and told [him] to go home and administer moist heat and lie down in a flexed position." Thereafter, claimant saw Petty from time to time and received physical therapy until January 28 when the doctor became angry because Sonaggera continued to complain of back pain while he (Petty) could not figure out what was wrong.

On February 12 claimant was seen by Dalton McInnis, M.D., his family doctor. He too thought the problem was a strain. Meanwhile, the company became upset because claimant had gone to a physician of his choice and it told him that if he continued to do this his temporary compensation would be cut off. The employee later returned to Petty, who next referred him to Thomas Howard, M.D., another McBride Clinic physician. Howard examined Sonaggera.

"He told me I did have back problems," said the claimant. "[H]e thought I should enter the hospital ... for traction treatments ... [and] if [that] didn't help then he would consider a myelogram and surgery."

Sonaggera went into the hospital March 13 on the service of Howard and was diagnosed as having "LS [lumbar sacral] strain with probable pathologic L4/5 disk." He was given "[c]onservative [nonsurgical] back care" and released with a final diagnosis of "[h]erniated nucleus pulposus, probably L4/5," which "failed to respond satisfactorily" to the conservative treatment.

On April 7 Howard wrote the company saying he thought Sonaggera should be hospitalized for a "myelogram and surgery." On April 10 Howard wrote that the patient "is now being treated ... for herniated nucleus pulposis [sic] of L4–5 ... [and] will be admitted [to the hospital] on April 14 ... [and] will undergo a myelogram on April 15, 1980, with surgery April 16, 1980."

The patient, however, decided not to rush into the operating room. Instead, he sought another medical opinion triggering the wrath of Howard who lashed out with an incredible response in a letter to Dayton Tire dated April 24.

"Mr. Sonaggera called informing me he would not be in for admission [on April 14]," wrote Howard. *"Therefore, it is my opinion that Mr. Sonaggera has apparently recovered and is dismissed from treatment with no impairment."* [1]

Professional help was sought by the worker from J. D. McGovern, M.D., on April 14. This physician discouraged surgery and recommended further conservative treatment "for a few months to see if this disc protrusion will subside without surgery." On May 30 McGovern reported that Sonaggera had shown some improvement and that several more months care was indicated. He noted that recovery in such cases "without any surgery is usually successful 70% of the time."

And so at the time of the hearing on June 9, 1980, Sonaggera was following the treatment prescribed by McGovern—rest, moist heat to his back, specific exercises, and a special diet.

## II

■ The employer's first complaint—that the trial court ordered a change of physicians—is an outgrowth of its unhappiness with claimant for going to a physician of his choice, McGovern, for medical treatment. The argument is that the statute giving the worker a right to do this also requires "that the attending physician so selected by the employee shall notify the employer and/or the insurance carrier within a reasonable time after examination or treatment was first rendered," [2] and this McGovern failed to do. Under these circumstances, says Dayton, it was improper for the court to order Dayton to pay for medical care "by a competent physician to be selected by the claimant." [3]

---

1. (emphasis added)

2. 85 O.S.1978 Supp. § 14.

3. We would be entirely justified in ignoring this "proposition" as well as Dayton's other two because none was set forth in its petition for review. The only "points of law" it sets out there are these: (1) the award "is contrary to the evidence ... and ... the law ..."; (2) the "Findings of Fact are not sustained by competent evidence"; (3) the "Conclusions of Law and Fact ... are contrary to the facts, evidence and the law ..."; and (4) the "Workers' Compensation Court lacked jurisdiction over this cause." These are general statements, not "precise points of law" required by Rule 1.103, Appellate Procedure, 12 O.S.1971 Ch. 15, App. 2.

In the first place, the court did not "order a change of physicians." In the second place, Dayton's supporting argument deals with an entirely different complaint, namely, that it should not have to pay McGovern for past medical expenses because he failed to give § 14 notice of his selection.

■ The order as it is worded deals with future medical costs. There is nothing in the record to indicate Dayton objected to paying McGovern. The only thing we can find it complained about in the trial court is that "Mr. Sonaggera refused medical treatment that was prescribed." This undoubtedly refers to claimant's refusal to submit to the hazards of a myelogram and back surgery Howard wanted to perform. If so, the complaint suggests the brief writer's unfamiliarity with the elementary principle that an employee is under no obligation to submit himself to dangerous medical procedures.[4]

Dayton's first point is without substance.

### III

■ The employer's second point—that it should not have to pay compensation for the week of March 5, 1980, to March 11, 1980—seems trivial enough and relatively thought-free.

What Dayton is complaining about is the fact claimant delayed for a week going into the hospital for a few days of "traction" because of a previously scheduled divorce hearing. Dayton characterized this postponement as a "refusal to accept conservative treatment" and a "willful and an unjustifiable interference with a reasonable and proper course of treatment" which "absolved [it] from the obligation of providing compensation during the period of refusal." Piffle. The incident occurred some three months after the injury. Howard, the physician who recommended the "treatment," is not reported to have objected to the slight delay. Dayton made no effort to show that the delay had any effect one way or the other on the employee's condition. And finally, when the worker did receive the traction "treatment" it apparently had no curative effect, demonstrating that it was immaterial whether he ever got it.

And, as we said earlier, this tenuous "point of law" seems not to have crossed Dayton's mind until the writing of its appellate brief.

### IV

■ Dayton's third "proposition" is that the "unilateral activities prescribed by claimant's physician do not constitute medical benefits under" the act for which it must pay.

The argument is that since Sonaggera was told "to come back [to his physician] *whenever* he needed to see him," the effect was that the employee was receiving "no treatment at all, [but] just activities at the decision of Claimant." That is, claimant "can decide *if* and *when* he needs treatment, and consequently how long he is going to be temporarily totally disabled."

Again, this is an alogism which approaches the ultimate in sophistry. First of all, the reason for the arrangement, according to the evidence, can be laid at the doorstep of Dayton's obstinate refusal to pay McGovern's bill. It was aimed at trying to reduce the financial burden on the hapless injured worker who, it appeared, might have to pay McGovern himself.

Secondly, the so-called "unilateral activities" complained of antedate the order appealed and cannot possibly be evidence of what has taken place post judgment. Presumably, since Dayton is ordered to pay McGovern's bill the physician may have set up regular office visit dates, particularly if he heard about Dayton's complaint. As a matter of fact, to appease Dayton he may make the visits rather frequent so as not to offend the employer's concept of proper "bilateral activity."

Since Dayton and its carrier stipulated to the jurisdiction of the court and argued none of the other three generalizations in its brief, one might well assume this appeal is motivated more by the desire for delay than by a legitimate interest in correcting a trial court error.

4. *E. L. Mendenhall Co. v. Kell*, Okl., 359 P.2d 234 (1961).

Thirdly, it is an affront to common sense to equate seeing a physician with treatment. This is akin to confusing gasoline with a visit to a service station. McGovern did examine Sonaggera and for treatment put him on a reducing diet and ordered the application of heat to his back, specific flexion exercise of a limited nature, and regulated rest. Claimant could follow this regimen at home without seeing the physician every day. Of course, we can assume the physician has checked the patient every month or so since the date of the temporary order in an effort to determine what, if any, progress his condition is making. But this has to be speculation. The subject matter has yet to come before the trial court and will not until a hearing is set to determine what permanent disability the worker may have sustained.

The employer and its carrier are ordered to pay the costs of this appeal including an attorney's fee of $1,500 for the use and benefit of claimant's attorney for prosecuting this appeal.

Affirmed.

BOYDSTON, J., concurs.

BACON, P. J., concurring in result.